UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROY JOHNSON, an individual, and JAMES BRESLO, an individual,<br><br>                Plaintiffs,<br><br>v.<br><br>AGS CJ CORPORATION, formerly known as Amaya Americas Corporation,<br><br>                Defendant. | Case No. 23-cv-2114 |

## COMPLAINT

Plaintiffs Roy Johnson ("**Johnson**") and James Breslo ("**Breslo**") bring this breach-of-contract action against Defendant AGS CJ Corporation, formerly known as Amaya Americas Corporation ("**Amaya**"), and state the following:

### PRELIMINARY STATEMENT

1.      This action arises from Amaya's breach of its contractual obligation to pay Plaintiffs a $7 million "holdback amount" after satisfaction of all pertinent conditions precedent.

2.      Plaintiffs bring this action in light of the United States Supreme Court's watershed decision last year in *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929 (2022), which vacated the Fifth Circuit's judgment and found in favor of the Ysleta Del Sur Pueblo Tribe (the "**Tribe**") and against the State of Texas in its attempt to shut down the Tribe's gaming machines.

3.     Plaintiffs are two individuals who owned and operated a small business called Diamond Game Enterprises ("**Diamond Game**"). In 2013, Amaya offered to buy Diamond Game for $25 million, and Plaintiffs accepted. Plaintiffs and Amaya entered into a written contract.

4.     Before the sale closed under the parties' original contract, Amaya raised concerns that a particular unresolved regulatory issue could negatively impact Diamond Game's business. As a result, the parties modified the deal. In essence, the parties agreed that Amaya would hold back $7 million of the $25 million purchase price until the regulatory issue was resolved favorably. The parties intended the holdback provision to shift a specific regulatory risk—not every business risk—to Plaintiffs.

5.     The modified deal closed in 2014. In the ensuing years, Amaya and its affiliates profited handsomely from Amaya's acquisition of Diamond Game. In 2015, about a year after the acquisition, Amaya's then-parent company (Amaya Inc.) spun off and resold 60% of Amaya's stake in Diamond Game for more than CAD$34 million via an initial public offering that reflected a total valuation in excess of CAD$66 million. (In 2017, Amaya Inc. sold its remaining 40% stake in Diamond Game for more than CAD$20 million.)

6.     The regulatory concerns that motivated the creation of the holdback provision ultimately proved unnecessary, as the regulatory issue never developed into a material impediment to Diamond Game's business. Diamond Game's machines continued to operate without legal or regulatory impediment, and could still be

operating to this day had Diamond Game maintained its business relationship with the Tribe.

7.     Disagreements arose between the parties regarding Plaintiffs' entitlement to the holdback amount.

8.     In 2022, the Supreme Court issued its game-changing decision in *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, which favorably resolved the regulatory issue underlying the creation of the holdback provision, thereby satisfying the sole outstanding contractual condition to payment of the holdback amount.

9.     Although all pertinent contractual conditions have now been satisfied, Amaya still wrongfully refuses to pay Plaintiffs the holdback amount.

## PARTIES, RELATED ENTITIES, JURISDICTION, AND VENUE

10.     Plaintiff Johnson is an individual who is a citizen of and domiciled in the state of Washington.

11.     Plaintiff Breslo is an individual who is a citizen of and domiciled in the state of California.

12.     Defendant AGS CJ Corporation is a Delaware corporation with its principal place of business in Nevada. AGS CJ Corporation is the successor by name change to Amaya Americas Corporation and is thus referred to herein as "Amaya."

13.     When Amaya acquired Diamond Game in 2014, Amaya was owned by Amaya Inc. On August 1, 2017, Amaya Inc. changed its name to The Stars Group Inc.

14.     On or about May 29, 2015, Amaya Inc. sold Amaya Americas Corporation (*i.e.*, Defendant) to AP Gaming Holdco, Inc. In or about December 2017, AP Gaming Holdco, Inc. changed its name to PlayAGS, Inc. ("**PlayAGS**"). (Plaintiffs

are not responsible for the confusing changes in corporate names and control following the 2014 sale of Diamond Game to Amaya.)

15.     Plaintiffs' damages resulting from the conduct giving rise to this action exceed $75,000.

16.     As there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, this Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

17.     This action arises from Amaya's breach of a contract in which the parties agreed that the state courts of the State of New York or the United States District Courts located in New York, NY would have exclusive jurisdiction and venue for any disputes arising thereunder.

18.     Accordingly, personal jurisdiction and venue are proper in this Court.

## STATEMENT OF FACTS

### I.     Background

19.     The instant dispute relates to and arises from a history of protracted litigation between the State of Texas and the Ysleta del Sur Pueblo Tribe, also known as the Tigua Tribe of Texas. That history backdropped the negotiation of the contractual provisions at issue now. As a result, this contractual dispute between Plaintiffs and Amaya is intertwined with the separate, but related, saga of litigation between the Tribe and the State of Texas, which ultimately culminated in the Supreme Court's game-changing decision in *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929 (2022).

20.    The Tribe is a federally recognized Indian Tribe, and its reservation lies near El Paso, Texas, where it operates the Speaking Rock Entertainment Center.

21.    In 1987, Congress adopted the Ysleta del Sur and Alabama and Coushatta Indian Tribes of Texas Restoration Act, 101 Stat. 666 (the "**Restoration Act**"). Among other things, the Restoration Act prohibited, on tribal lands, "all gaming activities which are prohibited by the laws of the State of Texas." 101 Stat. 668.

22.    In 1988, Congress adopted the Indian Gaming Regulatory Act ("**IGRA**"), 102 Stat. 2467, 25 U.S.C. § 2701 *et seq.* Among other things, IGRA permitted Indian Tribes to offer so-called class II games—like bingo—in States that "permi[t] such gaming for any purpose by any person, organization or entity." 25 U.S.C. § 2710(b)(1)(A). To ensure compliance with the statute's terms, IGRA created the National Indian Gaming Commission. § 2704(a).

23.    For decades, the State of Texas sought to enjoin the Tribe from instituting various forms of gaming on its reservation, arguing that (i) the Restoration Act displaced IGRA and required the Tribe to follow all of the State's gaming laws on tribal lands, and (ii) the Tribe's gaming activities violated Texas law and 25 U.S.C. § 1300-6 of the Restoration Act.

24.    In 1993, the Tribe initiated a lawsuit against the State of Texas, *Ysleta Del Sur Pueblo v. State of Tex.*, No. P–93–CA–29 (W.D. Tex. 1993), in the United States District Court for the Western District of Texas (the "**Texas Court**") seeking to force the State to negotiate a compact under IGRA. Initially, the Texas Court

granted summary judgment for the Tribe. *Ysleta Del Sur Pueblo v. State of Tex.*, 852 F. Supp. 587, 597 (W.D. Tex. 1993). On appeal, however, the Fifth Circuit reversed and held that the Restoration Act's directions superseded IGRA's and guaranteed that all of "Texas' gaming laws and regulations" would "operate as surrogate federal law on the Tribe's reservation." *Ysleta del Sur Pueblo v. Texas*, 36 F. 3d 1325, 1326, 1334 (5th Cir. 1994) ("***Ysleta I***").

25.     A quarter century of confusion and litigation followed. Repeatedly, the Tribe sought to conduct gaming operations within the confines of *Ysleta I*. Repeatedly, Texas argued that the Tribe's activities exceeded the Fifth Circuit's mandate.

26.     In 1999, the State of Texas initiated a new lawsuit against the Tribe, *State of Texas v. Ysleta Del Sur Pueblo, et al.*, No. EP-99-CV-320-KC (W.D. Tex. 1999) (the "**Texas Action**"), alleging that the Tribe was engaged in illegal gambling operations.

27.     In 2001, the Texas Court entered a broad injunction that essentially prohibited the Tribe from engaging in any form of gaming activity. *Texas v. del Sur Pueblo*, 220 F. Supp. 2d 668 (W.D. Tex. 2001) ("***Ysleta II***"). In subsequent orders, the Texas Court modified the blanket prohibition, creating exceptions for certain gaming activities. *See, e.g.*, *Texas v. Ysleta Del Sur Pueblo*, No. EP-99-CA-320-H, 2009 WL 10679419, at *4 (W.D. Tex. Aug. 4, 2009) ("***Ysleta III***"). The Texas Court also formalized a pre-approval process for enforcing the injunction. Under this pre-approval process, the Tribe was required to submit detailed proposals for the specific

gaming activities it wished to conduct. The court would review the details of the Tribe's proposed conduct and determine its legality under Texas law.

## II.    Events Preceding Amaya's Acquisition of Diamond Game

### A.    *The Original Stock Purchase Agreement*

28.    Diamond Game is a gaming company that manufactures, sells, and leases gaming and lottery equipment in North America. It was an innovative leader in the Class II Native American casino market.

29.    Plaintiffs owned 100% of the shares of Diamond Game prior to its sale to Amaya in 2014.

30.    In 2008, Diamond Game and the Tribe entered into a Sweepstakes Equipment Agreement (the "**2008 Lease**") pursuant to which Diamond Game leased sweepstakes terminals and related equipment to the Tribe. The 2008 Lease was a revenue share agreement, under which the Tribe received 70 percent, and Diamond Game received 30 percent, of the revenue generated by the leased equipment.

31.    In 2013, the 2008 Lease produced less than twenty percent of Diamond Game's annual revenue.

32.    At the time, Diamond Game leased machines that offered a particular version of sweepstakes to the Tribe. This version required patrons to make a donation to the Tribe and, in return, they received sweepstakes entries giving them a chance to win a prize. Other third-party vendors also leased similar machines to the Tribe that offered donation sweepstakes.

33.    In 2013, Amaya expressed a desire to purchase Diamond Game from Plaintiffs. Consequently, on June 10, 2013, Plaintiffs and Amaya entered into a Stock

Purchase Agreement (the "**Original SPA**"), whereby Amaya agreed to purchase Plaintiffs' shares in Diamond Game for $25 million.

> B.     *The Parties' Decision to Amend the Stock Purchase Agreement*

34.     On or about July 19, 2013—prior to the closing of the sale of Diamond Game pursuant to the Original SPA—the Texas Attorney General sent a letter addressed to the Tribe, copying various vendors, including Diamond Game. In the letter, the Texas Attorney General's Office gave notice that it believed the Tribe and various vendors, including Diamond Game, were in "potential violation of the federal injunction" due to their operation of "sweepstakes games" at the Tribe's facilities.

35.     On July 25, 2013, Plaintiff Breslo sent an email to David Baazov ("**Baazov**")— Amaya's Chief Executive Officer at the time—to inform him of the Texas Attorney General's letter. Breslo wrote, in pertinent part:

> Another issue for potential discussion is that we learned on Friday that the Tigua Tribe in Texas where we have machines received a letter from the state AG insisting that they permit the state to inspect their facility. The state is alleging that the tribe is illegally operating slot machines, while the tribe maintains they are legal sweepstakes machines.

36.     On September 24, 2013, the State of Texas filed a motion for contempt (the "**Contempt Motion**") in the Texas Action against the Tribe and various vendors, including Diamond Game. The motion, later amended on November 27, 2013, was premised on the contention that the Tribe's sweepstakes operations violated the injunction in the Texas Action.

37.     On September 28, 2013, Breslo emailed Baazov at Amaya to inform him of the Contempt Motion.

38.     After learning about the Texas Attorney General's letter and the Contempt Motion, Amaya conducted additional due diligence with respect to its potential acquisition of Diamond Game, and Plaintiffs and Amaya discussed amending the Original SPA.

39.     Amaya expressed concerns about the perceived "regulatory risk" associated with the Contempt Motion. In response to Amaya's concerns, Diamond Game conferred with the Texas Attorney General's Office to confirm that the State of Texas would dismiss Diamond Game from the Texas Action if Diamond Game stopped leasing machines directly to the Tribe. On November 13, 2013, Breslo emailed Amaya to share that the "AG is willing to take [Diamond Game] out of the case if [Diamond Game] leases its games to another vendor."

40.     Despite its apparent regulatory concerns, Amaya helped devise a workaround. On or about January 16, 2014, Diamond Game and Blue Stone, an entity created and owned by Plaintiff Johnson, entered into an Equipment Lease Agreement (the "**Texas Lease**") under which Diamond Game leased the sweepstakes terminals and other equipment then deployed with the Tribe to Blue Stone. On the same day, Blue Stone and the Tribe entered into a Promotional Sweepstakes Agreement (the "**Texas Lease Tribal Agreement**"), under which Blue Stone leased sweepstakes terminals and other equipment to the Tribe. The Texas Lease and the Texas Lease Tribal Agreement together replaced Diamond Game's 2008 Lease with the Tribe. In effect, this arrangement shifted the perceived legal risk associated with the Contempt Motion from Diamond Game to Blue Stone.

41.     Amaya was involved in the drafting and negotiation of the Texas Lease and the Texas Lease Tribal Agreement.

42.     As a result of the Blue Stone workaround, the Texas Attorney General voluntarily dismissed Diamond Game from the Contempt Motion on January 21, 2014.

43.     At the same time that Diamond Game was negotiating with the Texas Attorney General, Plaintiffs and Amaya negotiated an amendment to the Original SPA.

44.     On February 13, 2014, the parties amended the Original SPA by executing the First Amendment to Stock Purchase Agreement (the "**First Amendment**") (together with the Original SPA, the "**Amended SPA**").

        C.     *Terms of the Amended SPA*

45.     The First Amendment made several changes to the Original SPA. The principal change was the creation of a "Holdback Amount" of $7 million from the total purchase price, which Amaya agreed to pay Plaintiffs (and others designated by Plaintiffs) upon the satisfaction of certain conditions related to the Texas Action that were referred to as "Texas Clearance Event Conditions."

46.     Section 12 of the Amended SPA defines the "Texas Clearance Event Conditions," in pertinent part, as follows:

> Texas Clearance Event Conditions means the satisfaction
> . . . of each of the following:
>
> (i)     a Texas Clearance Event shall have occurred [. . .];

10

(ii)    the Texas Lease [between Diamond Game and the Texas Lease Operator executed on January 16, 2014] shall have terminated and shall be of no further force or effect;

(iii)    [Diamond Game] shall have the right, free and clear of all Encumbrances [. . .] to possess the Texas Equipment; and

(iv)    the Texas Lease Tribal Agreement shall have been duly assigned to [Diamond Game] either (A) by the Texas Lease Operator or (B) automatically by operation of the Texas Lease Tribal Agreement in accordance with the terms thereof, together with any required consent by the YDSP Tribe, and the Texas Lease Operator shall thereafter have no rights or interest therein.

47.    Section 12 of the Amended SPA separately defines a "Texas Clearance Event" to include:

(ii) the final disposition of the Texas Motion or Texas Action by a court of competent jurisdiction . . . which permits continued operation of the Texas Equipment with or without commercially reasonable modifications to the Texas Equipment; [or] **(iii) any other legislative or regulatory event that permits the continued operation of the Texas Equipment with or without commercially reasonable modification to the Texas Equipment** . . . .

(Emphasis added.)

48.    Conversely, the Amended SPA sets forth what happens in the event of an unfavorable resolution of the underlying regulatory issue: Section 1.7 of the Amended SPA provides that "upon the occurrence of a Texas Event, and written notice from [Amaya] to [Plaintiffs'] Representative of such occurrence," Plaintiffs forfeit any right to the $7 million Holdback Amount.

49.    The Amended SPA defines a "Texas Event" to include:

(i) the final disposition of the Texas Motion or Texas Action by a court of competent jurisdiction, including any and all appeals, pursuant to which the continued performance under the Texas Lease or otherwise in connection with the Company's Business with or related to the YDSP Tribe is determined not to be permissible under applicable Law and there are no commercially reasonable modifications that can be made to the Texas Equipment that would make the operation of the Texas Equipment permissible under applicable Law . . . or (iii) the Company's continued performance under the Texas Lease or otherwise in connection with its Business with or related to the YDSP Tribe has become impermissible under applicable Law, whether due to a change in Law or applicable interpretation thereof by a Governmental Authority of competent jurisdiction, in either case occurring at any time after the date hereof and there are no commercially reasonable modifications that can be made to the Texas Equipment that permit the continued performance by the Company under the Texas Lease following such change in Law or applicable interpretation thereof.

50.     The Amended SPA does not expressly define the phrase "regulatory event" as used in romanette (iii) within the definition of "Texas Clearance Event."

51.     The Amended SPA does, however, define the distinct, but related, phrase "Texas Regulatory Event" to include scenarios in which:

the Company's grant of, or performance under, the Texas License has become impermissible under applicable Law, **whether due to a change in Law or applicable interpretation thereof by a Governmental Authority of competent jurisdiction**, in either case occurring at any time after the date hereof.

(Emphasis added.)

52.     The Amended SPA expressly defines the phrase "Governmental Authority" to include "any court."

53.     The Amended SPA does not include a "drop-dead" date limiting Plaintiffs' entitlement to the Holdback Amount; nor does the Amended SPA specify a date certain by which a Texas Clearance Event must occur. Amaya bargained for this, as the absence of a drop-dead date with respect to the Holdback Amount allowed Amaya to postpone payment of the full purchase price, potentially indefinitely.

54.     When entering into the First Amendment, Amaya knew that there had been a longstanding dispute between the State of Texas and the Tribe, and that such dispute could take a long time to resolve.

55.     Indeed, on October 8, 2013, after the State of Texas filed the Contempt Motion, Plaintiff Breslo sent a (prescient) email to Baazov and Daniel Sebag ("**Sebag**") at Amaya, stating, in pertinent part, as follows:

> We see this as Round 7 of a 15 round back and forth between the state and the tribe.
>
> However, it goes without saying that, due to the longstanding dispute, this revenue stream has always been not as secure as with other customers as a result.
>
> This new action is not likely to be resolved for at least 6 months. If tribe wins this round, they will likely be good indefinitely. . . . If they lose, they can appeal and seek a stay; AND/OR modify machines to comply with new ruling, AND/OR try something else, like bingo, or go to legislature. They have survived with some form of gaming for about 15 years and have a lot of local and political support.

56.     On November 18, 2013, Sebag emailed Breslo stating, in pertinent part: "It's a holdback until texas is resolved." On November 20, 2013, Sebag again wrote to Breslo, stating, in pertinent part:

> The full 7 million dollars holdback will be retained until the texas matter is settled. . . . The 7 million dollar release is contingent on resolving texas definitively.

57.     On November 20, 2013, Breslo responded to Sebag, writing in pertinent part:

> While [Baazov] has previously mentioned a 6 month period to the holdback, your current proposal could be unlimited as no one can predict when the case will be "definitively resolved"; we need [to] discuss the terms of the escrow agreement, i.e. how "resolved" is defined and/or an outside date.

58.     On December 9, 2013, one of Amaya's attorneys at Greenberg Traurig emailed a draft of the First Amendment to Plaintiffs' attorney at McAfee Taft. In that draft, Amaya proposed a definition of the phrase "Texas Clearance Event Conditions" that included a condition that "a Texas Clearance Event shall have occurred on or prior to the one (1)-year anniversary of the Closing Date."

59.     On December 15, 2013, Plaintiffs' counsel emailed Amaya's counsel a redlined draft and explanatory comments. In rejecting the one-sided deadline proposed by Amaya, Plaintiffs' counsel commented as follows:

> As we discussed on the phone, we do not believe a drop dead date on Amaya's side is appropriate. . . . In an effort at compromise, we have removed all time limits and simply tied the Holdback to the final disposition one way or another, including all appeals. . . .

60.     At the time of contracting, the parties understood that the value of Diamond Game, including its Texas business, existed not primarily in particular physical machines, but in Diamond Game's potential, as an ongoing business, to generate future revenue and growth based on intangible assets, including its industry

knowledge, customer relationships, licensing, and so forth. Accordingly, Amaya elected to structure its acquisition of Diamond Game as a stock purchase, not an asset sale. Amaya bought from Plaintiffs an entire business—with the potential upside *and downside* that entails—not simply a batch of equipment.

61.     When Amaya acquired Diamond Game, Diamond Game's machines were operating in several markets in the United States and Canada. Most of Diamond Game's customers could cause the machines to be removed at virtually any time, for any reason. Amaya understood and accepted that risk when it acquired Diamond Game.

62.     When negotiating and agreeing to the First Amendment, the parties also understood that the "Texas Equipment" could change over time for a variety of reasons—for example, machines might break down; the "themes" of games might need updates to remain competitive; and so forth.

63.     Accordingly, the Amended SPA does not define the "Texas Equipment" as a particular type of equipment, recognizing that the number and nature of the equipment could evolve over time. Instead, Section 1.6 of the Amended SPA defines the "Texas Equipment" to mean "all of [Diamond Game's] equipment and accessories leased to the Texas Lease Operator under the Texas Lease."

64.     In turn, Section 2(b) of the Texas Lease expressly contemplates that the equipment leased thereunder could change over time, as reflected in either exhibits attached to the Texas Lease or "the records of Diamond Game."

65.    The language of the Amended SPA reflects the parties' intent that payment of the Holdback Amount would be premised on resolution of a specific regulatory issue, not on whether particular machines remained in place or continued to generate revenue. Accordingly, the Amended SPA does not require that the Texas Equipment generate a certain amount of, or any, revenue in order for the Texas Clearance Event Conditions to be satisfied.

III.    **Events Following Amaya's Acquisition of Diamond Game**

66.    On February 13, 2014, Plaintiffs and Amaya closed on the Amended SPA and Amaya acquired 100% ownership of Diamond Game.

67.    Blue Stone continued to lease machines to the Tribe until January 2016.

68.    The Diamond Game machines that were leased to the Tribe were capable of offering various forms of sweepstakes, charitable raffles, skill-based games, pull-tabs, and bingo. In some cases, converting those machines to a different offering required only a software change. In other cases, a minor hardware change was also required. All of the machines leased to Blue Stone (and, in turn, the Tribe) were readily capable of modifications to offer different gaming experiences besides sweepstakes, including, at a minimum bingo.

69.    On at least one prior occasion, Diamond Game had converted the machines, at the Tribe's direction, from selling internet time with a sweepstakes to a charitable donation with a sweepstakes.

70.    Diamond Game had bingo and pull-tab (a form of bingo) machines operating in other locations utilizing the same type of machines that had been at the Tribe's venues.

71.     Amaya's acquisition of Diamond Game proved lucrative for Amaya and Amaya's then-parent, Amaya Inc. (now known as The Stars Group Inc.).

72.     After it was acquired by Amaya, Diamond Game received millions of dollars in revenue from the machines leased to Blue Stone, which generally paid Diamond Game $13.11 per day, per machine.

73.     About a year after acquiring Diamond Game, Amaya spun off Diamond Game into a newly-formed entity, Innova Gaming Group, Inc. ("**Innova**"), owned by Amaya's then-parent company (Amaya Inc.). Amaya Inc. then took Innova public in an initial public offering ("**IPO**"), which closed on May 5, 2015. The IPO reflected a valuation of Diamond Game of more than CAD$66 million. In the IPO, Amaya Inc. sold approximately 60% of its shares in Innova and retained an approximately 40% ownership interest. Amaya Inc. received net proceeds in excess of CAD$34 million from the sale of 60% of its interest in Diamond Game through the Innova IPO.

74.     On or about October 9, 2015, the Tribe sent Blue Stone a letter giving notice that the Tribe did not intend to renew the Texas Lease Tribal Agreement with Blue Stone. The Tribe's letter noted, however, that it "should not be considered an end to [the Tribe's] willingness to work with the sweepstakes vendors," and that the Tribe planned "to continue utilizing many of [its] sweepstakes vendors for the pueblo's new gaming venture."

75.     On or about November 8, 2015, the Tribe communicated to Diamond Game that it wanted to replace the Texas Lease Tribal Agreement with a new "Tribal Location Agreement" that, among other things, provided for an 80/20 revenue split

between the Tribe and Diamond Game. While acknowledging that the proposed terms were "harsh," the Tribe stated that it was "a universal agreement" for its remaining sweepstakes vendors.

76.    Diamond Game machines continued to operate in the Tribe's facilities until January 2016, when the Tribe removed and returned the machines to Diamond Game solely for business reasons unrelated to the Texas Action or the Contempt Motion or any other regulatory issue. One factor in the machines' removal from the Tribe's facilities was that renovations had temporarily reduced floor space.

77.    At no point did the Texas Action or the Contempt Motion prevent placement of the Texas Equipment in the Tribe's facilities.

78.    The second and third Texas Clearance Event Conditions were satisfied on January 5, 2016, when Diamond Game terminated the Texas Lease and the remaining Texas Equipment was removed from the Tribe's facilities and returned to Diamond Game.

79.    After the machines leased to Blue Stone were removed from the Tribe's venue in January 2016, Diamond Game kept the machines and converted many of them to a form of bingo anticipating that they would be redeployed with the Tribe.

80.    On May 27, 2016, the Texas Court entered an order in the Texas Action in which it found that the Tribe's operation of sweepstakes terminals violated the 2001 injunction. *Texas v. Ysleta del Sur Pueblo*, 2016 WL 3039991, at *19 (W.D. Tex., May 27, 2016) ("***Ysleta IV***"). In the same order, however, the Texas Court observed that the "[t]he course of this litigation has transformed the Court into a quasi-

regulatory body overseeing and monitoring the minutiae of the [Tribe's] gaming-related conduct." 2016 WL 3039991, at *19. The Texas Court decided, *sua sponte*, to eliminate the pre-approval process that required the Tribe to submit proposals to the court seeking prior authorization to engage in gaming activities. 2016 WL 3039991, at *1. The Texas Court further noted that the Tribe had made "much of the notion that they are permitted to conduct various bingo activities," and the Texas Court stated that, "because the Court will no longer require the [Tribe] to submit proposals regarding their gaming activities, the Court does not opine on whether any proposed bingo activities are permissible under the Restoration Act." *Id.*, at *21. The Tribe elected not to appeal the Texas Court's decision in *Ysleta IV*.

81.     In or about July 2016 (about a month after *Ysleta IV*), the Tribe stopped offering sweepstakes games (in compliance with the deadline set by the Texas Court) and began offering electronic bingo games using the same devices.

82.     Multiple vendors that previously leased sweepstakes games to the Tribe made commercially reasonable modifications to their equipment and converted sweepstakes games to electronic bingo games, which the Tribe continues to operate to this day. Had Diamond Game's machines not been removed a few months earlier for business reasons, Diamond Game could have done the same thing, and its machines would also continue to operate to this day.

83.     The State of Texas later attempted to re-open the Texas Action to challenge the Tribe's new gaming activities by filing a "Third Motion for Contempt and Motion for Injunctive Relief." On March 10, 2017, the Texas Court denied the

State's motion and reminded the State that, under the Restoration Act, it must file a new case to challenge new gaming activities. *See* Texas Action, ECF No. 625 at 2–3.

84.     On or about March 22, 2017, Amaya Inc. filed a Form 40-F Annual Report with the United States Securities and Exchange Commission ("**SEC**") attaching an Annual Information Form as Exhibit 99.1. Tellingly, Amaya Inc. stated in that document:

> In February 2014, Amaya completed its acquisition of all the issued and outstanding equity of Diamond Game ***for approximately $25 million***, subject to customary post-closing purchase price adjustments and hold-backs, which included the retirement of Diamond Game's then-outstanding debt.

(Emphasis added.) Such language reflects the shared understanding that the presumptive purchase price for Amaya's acquisition of Diamond Game under the Amended SPA was $25 million.

85.     On June 2, 2017, the Texas Lease Tribal Agreement was duly assigned to Diamond Game, thereby satisfying the fourth Texas Clearance Event Condition.

86.     On June 7, 2017, the State of Texas commenced a follow-on lawsuit, *State of Texas v. Ysleta Del Sur Pueblo, et al.*, No. 3:17-CV-00179-PRM (W.D. Tex.) (the "**2017 Texas Action**") against the Tribe in the Texas Court, alleging that the Tribe's bingo operations subsequent to *Ysleta IV* were illegal under Texas Law.

87.     On or about August 3, 2017, The Stars Group Inc. (f/k/a Amaya Inc.) sold its remaining 40% ownership interest in Innova to a subsidiary of Pollard Banknote Limited ("**Pollard**") for approximately CAD$20 million.

88.     By spinning off and selling its ownership interests in Diamond Game through the Innova IPO in 2015 and the sale to Pollard in 2017, The Stars Group Inc. (f/k/a Amaya Inc.) received aggregate net proceeds of more than CAD$54 million. This compares to Amaya's purchase of Diamond Game for just $18 million, as it refuses to pay the $7 million holdback amount (a full 28% of the original purchase price) in violation of the terms of the Amended SPA.

89.     On or about March 14, 2018, The Stars Group (f/k/a Amaya Inc.) filed a Form 40-F Annual Report with the SEC, attaching an Annual Information Form as Exhibit 99.1. Tellingly, that document characterizes the transactions involving Diamond Game as follows:

> In May 2015, The Stars Group completed the spin-off of Diamond Game, *which it had purchased in February 2014 for approximately $25 million*, through the initial public offering (the "Innova Offering") of common shares of what was then known as Innova Gaming Group Inc. ("Innova"). The Innova Offering resulted in The Stars Group receiving aggregate net proceeds of approximately CDN$34.1 million and maintaining ownership of approximately 40% of the issued and outstanding common shares of Innova, which it subsequently disposed of in August 2017 for net cash proceeds of $16.1 million when Pollard Banknote Ltd. acquired Innova.

(Emphasis added.) Again, such language reflects the shared understanding that the purchase price for Amaya's acquisition of Diamond Game under the Amended SPA was $25 million.

90.     On February 14, 2019, the Texas Court issued a Memorandum Opinion and Order, which (i) held that the Tribe's bingo operations were unlawful and (ii) invited the State of Texas and the Tribe to submit proposed drafts of a permanent

injunction. *Texas v. Ysleta del Sur Pueblo*, 2019 WL 639971 (W.D. Tex. Feb. 14, 2019) ("**Ysleta V**").

91.     On March 28, 2019, the Texas Court entered a permanent injunction enjoining the Tribe's bingo operations "effective ninety (90) days after entry or ninety (90) days after the expiry of a stay, whichever comes later." *See* 2017 Texas Action, "Permanent Injunction" (Mar. 28, 2019) (ECF 202). At the same time, however, the Texas Court stayed the injunction pending completion of the appellate process. *See* 2017 Texas Action, "Order Staying Permanent Injunction" (Mar. 28, 2019) (ECF 203).

92.     The injunction entered by the Texas Court in the 2017 Texas Action never took effect.

93.     On March 21, 2019 (*before* the Texas Court issued and stayed its injunction in the 2017 Texas Action), an attorney at Greenberg Traurig named Drew Altman wrote Plaintiffs a letter on behalf of "The Stars Group Inc. (f/k/a Amaya Inc.) as successor by assignment to Amaya Americas Corporation (n/k/a AGS CJ Corporation)," claiming that a "Texas Event" had occurred under romanette (iii) within the definition of that phrase when the Texas Court issued its February 14, 2019 Memorandum Opinion & Order (*Ysleta V*). On March 28, 2019, an attorney for Plaintiffs sent a response letter denying that a Texas Event had occurred.

94.     Section 12 of the Amended SPA requires Amaya to send Plaintiffs written notice of any Texas Event in order to claim that a Texas Event has occurred. Amaya has never sent Plaintiffs written notice of the occurrence of any purported

"Texas Event" other than the Texas Court's decision in *Ysleta V* referenced in Mr. Altman's March 21, 2019 letter.

95.    Mr. Altman's letter demonstrates Amaya's recognition of the significance of the 2017 Texas Action to the holdback under the Amended SPA. Of course, when he sent his letter, Mr. Altman did not know that *Ysleta V* would subsequently be vacated pursuant to the Supreme Court's game-changing decision in *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929 (2022), and that the Texas Court's injunction in the 2017 Texas Action would <u>never</u> take effect.

96.    No valid Texas Event ever occurred, leaving the door open for a Texas Clearance Event to occur.

97.    On April 2, 2020, the United States Court of Appeals for the Fifth Circuit affirmed the Texas Court's decision to enjoin the Tribe's bingo operations. *State v. Ysleta Del Sur Pueblo*, 955 F.3d 408 (5th Cir. 2020) ("***Ysleta VI***").

98.    **Critically, on June 15, 2022, the United States Supreme Court vacated the judgment of the Fifth Circuit Court of Appeals and ruled in favor of the Tribe, allowing bingo gaming on tribal land without regulatory oversight from the State of Texas. *See Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929 (2022) ("*Ysleta VII*").**

99.    The Supreme Court held that the State's bingo laws were "regulatory" in nature and therefore inapplicable to the Tribe because Congress "did not provide for state 'regulatory jurisdiction' over tribal gaming."

100.    Following remand, Texas (i) agreed that the Supreme Court decision "resolved all claims in the case" and (ii) stipulated to dismissal of the 2017 Texas Action in its entirety. *See* Joint Status Report, *Texas v. Ysleta Del Sur Pueblo v. Texas*, Case No. 3:17-CV-00179, ECF 222 at 2 (W.D. Tex. Sept. 27, 2022). Accordingly, the Texas Court dismissed the 2017 Texas Action on September 29, 2022. *See* Order, ECF 224.

101.    As a result, the Tribe can and does continue to operate electronic bingo.

102.    On June 16, 2022 (one day after *Ysleta VII* was published), David Lopez—the President and Chief Executive Officer of Amaya's current parent, PlayAGS—issued a public statement expressly discussing the Supreme Court's ruling and announcing that "AGS stands by [its] Tribal operator partners as they look to exercise their rights."

103.    Likewise, on August 8, 2022, PlayAGS issued a press release discussing the Supreme Court's decision in *Ysleta VII* under the heading "Product & Market Highlights," explaining that the decision was "paving the way for the tribes to continue exercising their sovereign rights to offer non-prohibited gaming on tribal lands within the state."

104.    Mr. Lopez discussed the Supreme Court decision again during an earnings call on August 8, 2022, stating "we were able to benefit from a favorable June Supreme Court ruling to execute growth opportunities presented to us within the Texas Class II market."

105.   PlayAGS also discussed the Supreme Court decision in its Form 10-Q quarterly reports dated August 8, 2022 and November 8, 2022, when describing the "Key Drivers" of its business, explaining that the "Court's ruling determined that these Texas Tribes have the autonomy to regulate electronic bingo games on their lands . . . regardless of the state's rules on bingo, which is permitted in the State of Texas."

106.   PlayAGS also issued a press release on November 8, 2022 discussing its "decision to strategically expand [its] Class II EGM installed base within the state of Texas following the favorable Supreme Court ruling in June."

107.   During an earnings call on the same day, Brad Boyer—Senior Vice President of Corporate Operations and Investor Relations at PlayAGS—attributed the company's recent activities in part to the "favorable ruling that was issued by the Supreme Court," explaining that "the Speaking Rock facility in El Paso was really the area where we took advantage of the ruling."

108.   The Supreme Court decision in *Ysleta VII* and subsequent dismissal of the 2017 Texas Action against the Tribe constitute a "regulatory event" that permits the continued operation of the Texas Equipment with commercially reasonable modification, as contemplated by romanette (iii) within the Amended SPA's definition of a "Texas Clearance Event." Therefore, a Texas Clearance Event has occurred, and the first of the Texas Clearance Event Conditions has been satisfied.

109.   Accordingly, as of June 15, 2022, or at least as of September 29, 2022, all of the Texas Clearance Event Conditions had been satisfied.

110.    Section 1.7 of the Amended SPA requires Amaya to pay the Holdback Amount "on or prior to the tenth (10th) Business Day immediately following the satisfaction . . . of the Texas Clearance Event Conditions."

111.    Therefore, Amaya was required to pay the $7 million Holdback Amount to Plaintiffs no later than June 29, 2022, or at the latest October 13, 2022.

112.    On January 9, 2023, Plaintiffs sent a letter to Amaya demanding that it honor its obligation to pay the $7 million Holdback Amount. Amaya refused the demand in its response on January 24, 2023 and to date has not paid the holdback.

## IV.    Plaintiffs' Prior Lawsuit against Amaya

113.    Previously, on September 28, 2017, Plaintiffs commenced a lawsuit, *Johnson v. AGS CJ Corp.*, No. 17-CV-7438 (RA) (S.D.N.Y.) (the "**2017 SDNY Action**"), against Amaya premised on the contention that the Texas Court's May 27, 2016 Order in the Texas Action (*Ysleta IV*) constituted a "Texas Clearance Event" under romanette (ii) within the definition of that phrase because, by eliminating the pre-approval process, *Ysleta IV* effectively permitted the Tribe to conduct bingo gaming (and, indeed, the Tribe has done so ever since).

114.    In the 2017 SDNY Action, the court found, on April 7, 2020, that the Texas Court's May 27, 2016 Order did not constitute a "Texas Clearance Event" under the Amended SPA. *Johnson v. AGS CJ Corp.*, No. 17-CV-7438 (RA), 2020 WL 1689487 (S.D.N.Y. Apr. 7, 2020), *aff'd*, 844 F. App'x 453 (2d Cir. 2021). On that narrow basis, the court entered summary judgment in Amaya's favor, while expressly declining to resolve other issues.

115.    The instant lawsuit does <u>not</u> seek to challenge or re-litigate the court's judgment in the 2017 SDNY Action. That judgment does not insulate Amaya from its present payment obligation, which arises in connection with romanette (iii) within the definition of a "Texas Clearance Event" and events occurring subsequent to commencement of the 2017 SDNY Action. Accordingly, the doctrine of *res judicata* does not bar Plaintiffs' claims in this action.

116.    Indeed, in many ways, Amaya's arguments and the court's reasoning in the 2017 SDNY Action help demonstrate why Plaintiffs are entitled to the Holdback Amount now, after the Supreme Court's decision in *Ysleta VII*.

117.    For example, on May 25, 2018, Amaya's counsel (Stephen Saxl) appeared before the court in the 2017 SDNY Action and argued in support of Amaya's then-pending motion to dismiss (which the court subsequently denied). During that oral argument, Mr. Saxl stated, in pertinent part, as follows:

> Going back to the purpose of the contract, [the parties] called it a Texas clearance event. Clearance is required. Another example of clearance, another way they go could have gotten clearance was a legislative or regulatory event. Surely plaintiff would not be claiming that legislative silence permitted some other activity. Here, the [Texas Court in *Ysleta IV*] is not saying it is okay to engage, for example, in bingo activities. It is saying, We're not addressing that. That is not before us.

5/25/18 Transcript at 6:10–6:17. Those arguments inadvertently foreshadowed the Supreme Court's decision in *Ysleta VII*, which does affirmatively permit the Tribe to engage in bingo activities.

118.    As another example, in its April 7, 2020 Opinion & Order, the court cited and discussed the Texas Court's decision in *Ysleta V* and the Fifth Circuit's decision

in *Ysleta VI.* 2020 WL 1689487, at *6. Likewise, on appeal from the 2017 Action, the Second Circuit expressly cited the Fifth Circuit's decision in *Ysleta VI. See* 844 F. App'x at 455 ("We decline to find that the Texas Court 'permitted' the Tribe to use the machines for bingo, considering that the Texas Court . . . has since declared bingo unlawful, as affirmed by the Fifth Circuit."). Of course, neither the parties, nor this Court, nor the Second Circuit, knew then that the Supreme Court would later **vacate** the Fifth Circuit's judgment and fundamentally clarify the regulatory framework applicable to the Tribe's gaming activities.

## CAUSE OF ACTION — BREACH OF CONTRACT

119.    The Amended SPA between Amaya and Plaintiffs is a binding contract, under which the Parties have certain rights and obligations.

120.    The satisfaction of the Texas Clearance Event Conditions triggered Amaya's contractual obligation to pay the $7 million Holdback Amount to Plaintiffs.

121.    Amaya's failure to pay the $7 million Holdback Amount constitutes a material breach of the contract.

122.    In addition, implicit within the Amended SPA is a covenant of good faith and fair dealing, which prohibits Amaya from doing anything that would have the effect of impairing Plaintiffs' right to receive the fruit of the contract, even if the terms of the Amended SPA do not explicitly prohibit such conduct. *See, e.g., ABN AMRO Bank, N.V. v. MBIA Inc.,* 17 N.Y.3d 208, 228, 952 N.E.2d 463, 475 (2011).

123.    Amaya's duties of good faith and fair dealing under the Amended SPA encompass any promises which a reasonable person in Plaintiffs' position would be

justified in understanding were included. *See 511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 773 N.E.2d 496, 500–01 (2002).

124.    Amaya has breached its duties of good faith and fair dealing by, among other things, wrongfully refusing to pay Plaintiffs the Holdback Amount on contrived and pretextual grounds that are inconsistent with both the letter and the spirit of the Amended SPA.

125.    To the extent Amaya purports to justify its refusal to pay the Holdback Amount based on acts or omissions by Amaya, by its affiliates, successors, or assigns, or by Diamond Game subsequent to Amaya's acquisition of Diamond Game, such refusal constitutes a breach of the implied covenant of good faith and fair dealing.

126.    Amaya's breach has harmed Plaintiffs.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs Johnson and Breslo request entry of judgment against Defendant AGS CJ Corporation, formerly known as Amaya Americas Corporation, as follows:

  i.    Plaintiffs seek expectancy damages under the Amended SPA in the amount of $7 million.

  ii.   Plaintiffs also seek prejudgment interest, at the rate of 9% per annum as allowed under New York law, costs, attorneys' fees, and such other and any further relief to which Plaintiffs may be entitled.

Dated:          March 13, 2023

Respectfully submitted,

*/s/ David W. Leimbach*
David W. Leimbach (SDNY Bar # DL1788)
FREDERIC DORWART, LAWYERS PLLC
124 East Fourth Street
Tulsa, Oklahoma 74103
Tel: 918-583-9922
Fax: 918-583-8251
dleimbach@fdlaw.com

- and -

Stephen G. Traflet (SDNY Bar # ST9654)
TRAFLET & FABIAN
1180 Avenue of the Americas, 8th Floor
New York, NY 10036
Tel: 212-244-6199
Fax: 212-859-7313
straflet@trafletfabian.com

***Attorneys for Plaintiffs Roy Johnson
and James Breslo***