USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 3/25/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHNSON, *et al.*, <br><br> **Plaintiffs,** <br><br> -against- <br><br> AGS CJ CORPORATION, formerly known as AMAYA AMERICAS CORPORATION, <br><br> **Defendant.** | 23-cv-02114 (ALC) <br><br> <u>**OPINION & ORDER**</u> |

**ANDREW L. CARTER, United States District Judge:**

Plaintiffs, Roy Johnson and James Breslo ("Plaintiffs") bring this breach of contract action against Defendant AGS CJ Corporation, formerly known as Amaya Americas Corporation ("Defendant"). ECF No. 1 ("Compl."). Defendants moved to dismiss the Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) on July 28, 2023. ECF No. 26. For the reasons stated below, Defendants' Motion is **GRANTED**.

## BACKGROUND

### I. The Purchase Agreement

Plaintiffs, two individuals who owned and operated Diamond Game Enterprises ("DGE"), entered into an agreement with Defendant Amaya in 2013 for Amaya to purchase DGE for $25 million. Compl. at ¶ 3. Prior to the closure of the sale, the Parties agreed that Amaya would reserve $7 million of the purchase consideration in recognition of certain unresolved legal issues that could negatively affect DGE's valuation. *Id.* at ¶ 4. The legal risk undergirding the holdback provision was the ongoing litigation between the State of Texas and Ysleta del Sur Pueblo Tribe in which Texas was attempting to bar the Tribe from engaging in certain forms of gaming on its reservation. *Id.* at ¶¶ 19-23. The State of Texas and the Tribe went through

several rounds of litigation that spanned over two decades. *Id.* at ¶¶ 24-27. And as a result, the legality of the Tribe's gaming seesawed back and forth over that time. *Id.* Meanwhile, in 2008, DGE entered into a Sweepstakes Equipment Agreement with the Tribe under which DGE leased equipment and received 30 percent of the Tribe's revenue from gaming. *Id.* at ¶ 30. By the time the Parties were negotiating their acquisition agreement, DGE's revenue share with the Tribe constituted twenty percent of its annual revenue. *Id.* at ¶ 31.

That same year, the shadow of the Texas-Tribe litigation was cast across the negotiations as the Texas Attorney General notified DGE that it believed the Tribe, and DGE as its vendor, were violating the law. *Id.* at ¶ 34. Just a few months after that notification, DGE would be dragged into active litigation as the State of Texas filed a motion for contempt ("Texas Motion") against DGE for alleged failure to abide by an injunction filed in a prior action against the Tribe ("Texas Action"). *Id.* at ¶ 36.

Still desiring to close their deal, the Parties created a workaround. DGE entered into an equipment lease agreement with Blue Stone, a corporate entity created and owned by Plaintiff Johnson, by which Blue Stone obtained a lease on the sweepstakes equipment ("Texas Equipment") then utilized by the Tribe (the "Texas Lease"). *Id.* at ¶ 40. Blue Stone then also entered into a sweepstakes agreement with the Tribe by which Blue Stone subsequently re-leased the suspect sweepstakes equipment back to the Tribe ("Texas Lease Tribal Agreement"). *Id.* These transfer arrangements ostensibly excised the riskier Tribal agreement from DGE's ledgers and resulted in DGE being voluntarily dismissed from the litigation proceedings. *Id.*

The Parties then returned to the negotiating table and executed an amendment to their purchase agreement. *Id.* at ¶ 44. In recognition of the fact that the Blue Stone transfers decreased DGE's overall valuation, the Parties agreed to holdback $7 million from the total

purchase price. *Id.* at ¶ 45.  Under the amendment, Plaintiffs could receive the holdback amount upon the satisfaction of certain conditions related to the alleviation of the legal risk present in the Tribal equipment lease. *Id.* at ¶¶ 44-47. These conditions, referred to as the "Texas Clearance Event Conditions" stated as follows:

> Texas Clearance Event Conditions means the satisfaction . . . of the following:
> (i) a Texas Clearance Event shall have occurred [. . .];
> (ii) the Texas Lease [between DGE and the Texas Lease Operator] shall have terminated and shall be of no further force or effect;
> (iii) [DGE] shall have the right, free and clear of all Encumbrances [. . . ] to possess the Texas Equipment; and
> (iv) the Texas Lease Tribal Agreement shall have been duly assigned to [DGE] either (A) by the Texas Lease Operator or (B) automatically by operation of the Texas Lease Tribal Agreement in accordance with the terms thereof, together with any required consent by the YDSP Tribe, and the Texas Lease Operator shall thereafter have no rights or interest therein.

*Id.* at ¶ 46.  The amendment defined a "Texas Clearance Event" as including:

> (i) the dismissal of the Texas Motion or Texas Action [. . .];
> (ii) the final disposition of the Texas Motion or Texas Action by a court of competent jurisdiction, including any and all appeals, which permits continued operation of the Texas Equipment with or without commercially reasonable modifications to the Texas Equipment;
> (iii) any other legislative or regulatory event that permits the continued operation of the Texas Equipment with or without commercially reasonable modification to the Texas Equipment; or
> (iv) Buyer, in its sole discretion delivers written notice to Sellers' Representative that a Texas Clearance Event has occurred.

MTD at 8; *see also id.* at ¶ 46.  Finally, in February 2014, the Parties closed the sale and Blue Stone continued to lease the Texas Equipment to the Tribe. *Id.* at ¶ 67.

II.     **Post-Purchase Developments**

In October 2015, the Tribe gave Blue Stone notice that they did not intend to renew the equipment lease by invoking the agreement's termination clause. *Id.* at ¶ 74. By January 2016, the lease was completely terminated. The Texas Action also ended in 2016 with the Western

District of Texas finding the sweepstakes games unlawful and finding the Tribe in contempt for their illegal gambling activities. *Id.* at ¶ 80; *Texas v. Ysleta del Sur Pueblo*, 2016 WL 3039991, at *19 (W.D. Tex., May 27, 2016). The District Court did make clear that its opinion "d[id] not opine on whether any proposed bingo activities are permissible." *Id.* at *21. A month after the ruling, the Tribe began offering bingo games which operated entirely independently of Blue Stone and DGE's sweepstakes equipment. Compl. at ¶¶ 81-82.

In June 2017, the State of Texas commenced a separate lawsuit against the Tribe, claiming that the Tribe's bingo operations were illegal. *Id.* at ¶ 86; *see also State of Texas v. Ysleta Del Sur Pueblo, et al.*, No. 3:17-CV-00179-PRM (W.D. Tex.). That same day, Plaintiff Johnson assigned Blue Stone's interest in the Texas Lease Tribal Agreement, which the Tribe had unilaterally terminated the prior year, to DGE. *Id.* at ¶ 85. In February 2019, the Texas District Court held that the Tribe's bingo operations were unlawful and permanently enjoined them from such gaming operations. *Id.* at ¶¶ 90-91. In 2020, the Fifth Circuit affirmed the injunction. *See State v. Ysleta Del Sur Pueblo*, 955 F.3d 408 (5th Cir. 2020). In 2022, the Supreme Court vacated the Fifth Circuit's affirmation and remanded the case to the district court for further proceedings. *Id.* at ¶ 98; *see also Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929 (2022). The case was then dismissed on remand in line with the Supreme Court's decision thereby permitting the Tribe to legally operate electronic bingo gaming. *Id.* at ¶ 100.

### III.   Plaintiffs' Claim

Plaintiffs now bring this breach of contract action claiming that they are owed the $7 million holdback amount because sufficient contractual conditions have been met and because Defendant has breached a covenant of good faith and fair dealing by refusing to pay Plaintiffs the holdback amount. *Id.* at ¶¶ 119-126. Plaintiffs argue that Blue Stone's 2017 assignment of the

terminated lease agreement with the Tribe satisfied the condition requiring assignment to DGE and that the 2022 Supreme Court decision in favor of the tribe constituted a "legislative or regulatory event that permits the continued operation of the Texas Equipment." *Id.* at ¶ 8.

## LEGAL STANDARD

When considering a 12(b)(6) motion, a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement of relief." *Faber v. Metro Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficiently factual matter accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2 1059, 1067 (2d Cir. 1985). A reviewing court ought not dismiss a complaint where "enough facts to state a claim to relief that is plausible on its face" have been plead." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Moreover, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id.* at 663.

To sufficiently plead a breach of contract claim under New York law, a Plaintiff must establish "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation

omitted). "Agreements are interpreted in accordance with the parties' intent," and the executed written agreement is the best evidence of the parties' intent. *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 33 (S.D.N.Y. 2017). Therefore, "[i]n the absence of any ambiguity, [courts] look solely to the language used by the parties to discern the contract's meaning." *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 807 N.E.2d 876, 879, 775 N.Y.S.2d 765 (N.Y. 2004).

## DISCUSSION

Plaintiffs have not sufficiently pleaded facts plausibly establishing that the specific conditions requiring Defendant to relinquish the holdback amount were achieved. Despite Plaintiffs' best attempts to describe it as such, the Supreme Court's decision in *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929 (2022) does not qualify as a regulatory event in satisfaction of Clearance Event III. Additionally, Plaintiffs' transfer of a non-existent interest in a terminated agreement in an attempt to satisfy Clearance Condition IV is ineffective.

### I.   "Regulatory" Event

As stated previously, the purchase agreement addendum requires that one of the following Clearance Events be fulfilled to trigger Defendant's obligation:

> (i) the dismissal of the Texas Motion or Texas Action [. . .];
> (ii) the final disposition of the Texas Motion or Texas Action by a court of competent jurisdiction, including any and all appeals, which permits continued operation of the Texas Equipment with or without commercially reasonable modifications to the Texas Equipment;
> (iii) any other legislative or regulatory event that permits the continued operation of the Texas Equipment with or without commercially reasonable modification to the Texas Equipment; or
> (iv) Buyer, in its sole discretion delivers written notice to Sellers' Representative that a Texas Clearance Event has occurred.

MTD at 8; *see also* Compl. at ¶ 46. Plaintiffs claim that the Supreme Court's 2022 decision in *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929 (2022) constitutes a "regulatory event

that permits the continued operation of the Texas Equipment with or without commercially reasonable modification to the Texas Equipment." Compl. at ¶ 46. Plaintiffs, stating that the plain meaning of "regulatory" is "of or relating to regulation," argue that the "Supreme Court decision was an event relating to regulation." MTD Response at 10 (citing REGULATORY, Merriam-Webster Legal Dictionary, Merriam-Webster, https://www.merriam-webster.com/legal/regulatory).

This formulation of the text's plain meaning is unworkable. First, taken together, the first two Clearance Events lay out the specific judicial actions which would constitute qualifying conditions—namely, the dismissal or positive disposition of the Texas Motion. Under the established canon of *expressio unius est exclusio alterius*, the specific enumeration of these judicial events excludes the implication of others that might qualify. *See, e.g., Hardy v. N.Y. City Health & Hosps. Corp.*, 164 F.3d 789, 794 (2d Cir. 1999) (stating that the "mention of one thing implies the exclusion of the other"). Thus, the Supreme Court's 2022 decision and the District Court's subsequent dismissal of the Texas bingo action does not qualify because it is not expressly included in the enumeration of judicial Clearance Events.

Second, to read the contractual terms any other way would render several of the contractual terms impermissibly superfluous. *See Spinelli v. NFL*, 903 F.3d 185, 200 (2d Cir. 2018) (stating that all contractual terms must be given full "effect and meaning" and that interpretations rendering provisions "superfluous are . . . disfavored."). The plain meaning of "legislative," according to Plaintiffs' preferred source, includes "of or relating to a legislature." LEGISLATIVE, Merriam-Webster Legal Dictionary, Merriam-Webster, https://www.merriam-webster.com/legal/legislative. Under Plaintiffs' interpretation of the plain text, the Supreme Court's decision could just as much be deemed a legislative event because it engaged in

interpretation of federal legislation, thereby rendering superfluous the textual distinctions made between judicial, legislative, and regulatory outcomes. Such a result must be avoided.

Third, Plaintiff's desired interpretation does not gel with the plain meaning of the terms used in the contract. Contrary to Plaintiff's argument, "any other" here does not act as catch-all language that reflects "the parties' understanding that a judicial development could constitute a regulatory event." ECF No. 28 at 11. Read plainly, "any other" actually modifies both "regulatory" and "legislative," meaning that it simply sets apart the judicial events enumerated in the first two romanettes from those separate regulatory or legislative events contemplated in the third romanette. *Id.* If "any other" were to act as catch-all language in the manner that Plaintiffs argue it does, then its catch-all nature would have to apply equally to "legislative" events as it does for "regulatory" ones since "any other" modifies both adjectives. *Id.* Such an interpretation would mean that the Supreme Court's decision could be as much a legislative event as a regulatory one—a reading which Plaintiffs themselves tellingly do not pursue in their filings. Such a holding would have no basis in the plain meaning of the text.

## II. "Regulatory" Event

Plaintiffs' argument that Blue Stone's assignment of the terminated Texas Lease Tribal Agreement to DGE constituted satisfaction of Texas Clearance Event Condition IV, reproduced below, also fails.

> (iv) the Texas Lease Tribal Agreement shall have been duly assigned to [DGE] either (A) by the Texas Lease Operator or (B) automatically by operation of the Texas Lease Tribal Agreement in accordance with the terms thereof, together with any required consent by the YDSP Tribe, and the Texas Lease Operator shall thereafter have no rights or interest therein.

Compl. at ¶ 46. Blue Stone did not "duly assign[]" the Tribal Agreement to DGE because the Tribal Agreement had already been terminated for over a year by the time the purported

transfer took place. It is a basic contractual principle that, upon termination or repudiation of the agreement by a contractual party, an action for breach may follow. *See, e.g.,* Restat 2d of Contracts, § 250(a) ("[A] statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach."); *id.* at § 253(1) ("Where an obligor repudiates a duty before he has committed a breach by non-performance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for total breach."). The non-repudiating party's performance is subsequently discharged. *Id.* at § 253(2) ("Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance."). Therefore, upon termination, except in recovery for breach which is not relevant here, the contractual relationship between the parties is severed and no assignable interest remains as all prior contractual rights cease to exist. Plaintiffs attempts to manufacture sufficient assignment here can not be credited where they have not alleged any facts that could possibly support a claim that the Tribal Agreement has been duly assigned.

## CONCLUSION

The Court has considered Plaintiffs' remaining arguments and finds that they are without merit. Because they have failed to sufficiently plead fulfillment of the necessary clearance conditions obligating Defendant's performance, the motion to dismiss is **GRANTED** without prejudice. The Clerk of the Court is respectfully directed to terminate the motion. Plaintiff's motion for leave to amend must be filed by April 8, 2024.

**SO ORDERED.**

**Dated:  March 25, 2024**
       New York, New York

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**